**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| MALKITZEDEK ZIRKIND,<br>304 Charlton Court<br>Silver Spring, Maryland 20902 | *<br><br>* |
| *Plaintiff*, | * |
| v. | *    Case No. 8:25-cv-1716 |
| SEAN DUFFY, Secretary,<br>U.S. Department of Transportation,<br>Defendant | *<br><br>* |
| Serve on Kelly O. Hayes<br>U.S. Attorney for the District of Maryland<br>36 S. Charles Street 4th Fl.<br>Baltimore, MD 21201 | *<br><br>*<br><br>* |

*    *    *    *    *    *    *    *    *    *    *    *    *

**COMPLAINT FOR RELIGIOUS DISCRIMINATION**

**NATURE OF ACTION**

1.    This lawsuit involves claims by Plaintiff, Malkitzedek Zirkind ("Mr. Zirkind"), an Air Traffic Control Specialist, employed by the Federal Aviation Administration and Defendant, the United States Department of Transportation, arising from (1) its discrimination against him on the basis of his status as an Orthodox, Sabbath-observant Jew and (2) its failure to reasonably accommodate Mr. Zirkind's religious observance despite a lack of undue hardship to Defendant, both in violation of Title VII of the Civil Rights Act of 1964 as amended, and controlling United States Supreme Court jurisprudence.

**PARTIES**

2.    Mr. Zirkind is employed by Defendant in the Commonwealth of Virginia, and resides in Silver Spring, Maryland.

3.    Defendant is a federal agency with its principal office in Washington, D.C. which regularly conducts its governmental functions in Maryland.

**JURISDICITON AND VENUE**

4. This Court has subject matter jurisdiction pursuant to 8 USC § 1332 and, because this action is based on allegations that Defendant violated Plaintiff's civil rights, pursuant to 28 USC § 1343.

5. This Court has personal jurisdiction over Defendant because it regularly conducts its governmental functions in the state of Maryland and because Defendant's conduct has caused damage to Mr. Zirkind in the state of Maryland.

6. Venue in this Court is appropriate pursuant to 28 U.S.C.A. § 1391 (e) because Defendant is a federal agency, there is no real property involved in this action and Plaintiff resides in Montgomery County, Maryland.

**FACTS**

**A. Mr. Zirkind's Career to Date with Defendant and His Religious Observance**

7. Mr. Zirkind currently works as an Air Traffic Control Specialist ("ATCS") for the Federal Aviation Administration in the U.S. Department of Transportation ("DOT").

8. His position series/grade is AT/LH. He works at the ATO/ZDC ARTCC (Washington Center) located at 825 E Market Street, Leesburg, Virginia 20176.

9. He has worked in this series/grade for nearly five years, and for Defendant for more than eight years.

10. As a Sabbath-observant Orthodox Jew, Mr. Zirkind is prohibited from working from sundown Friday evening until shortly after sundown on Saturday evening (the "Sabbath"). He has never worked on the Sabbath while employed by Defendant or when working anywhere else. Accordingly, he requires an accommodation for Sabbath observance in the event his schedule would otherwise require him to work on the Sabbath.

11.     Defendant has been aware that Mr. Zirkind is a Sabbath-observant Orthodox Jew since informed it of that fact in writing during on-boarding in September 2016 prior to beginning training.

12.     His supervisors and Defendant's management officials were aware of his need for religious accommodation because he informed each of his supervisors as well as those involved in making his schedule of that fact. He also wears religious attire at work.

13.     While Mr. Zirkind has required accommodation to avoid working on the Sabbath since his employment with Defendant began, due to his training, lab work, classwork, and later, alternative scheduling due to the COVID-19 pandemic, he was, for the most part, able to manage his schedule to permit is Sabbath observance in 2017-2018 and 2020-2021 without significant need for accommodation.

14.     Due to seniority and the Collective Bargaining Agreement ("CBA") between National Air Traffic Controllers Association ("NATCA") and Defendant, in 2019 the line or schedule he bid required him to work on Friday evenings and Saturdays, but he was able to arrange to swap schedules with a colleague.

15.     The situation became unmanageable in 2022 when he could not bid a line that did not include Friday and Saturday work and could not arrange a swap. Accordingly, it was necessary for him seek accommodation from Defendant on a regular basis to avoid having to work on the Sabbath.

16.     Mr. Zirkind has consistently endeavored to  follow Defendant's guidelines in the Human Resource Policy Manual ("HRPM") and the memoranda and other instructions he has received regarding the appropriate manner to seek religious accommodation.

17.    Defendant's refusal to accommodate Mr. Zirkind's religious beliefs compelled him, since 2019, to use annual leave, FMLA/Paid Parental Leave that would otherwise have been used to provide support to and spend time with his family when they needed it, and holidays for which he would have received double pay if he did not have to burn them due to his Sabbath observance, just to avoid working on the Sabbath.

18.    Mr. Zirkind has also had to call in sick as a last resort when his Sabbath shift was approaching, and he had no other recourse.

19.    Using sick time for religious accommodation is at odds with Defendant's policies.

**B.    The Agreements and Policies that Defendant Claims It Must Abide by When Considering Mr. Zirkind's Requests for Accommodation**

20.    Defendant's employees responsible for managing Mr. Zirkind's schedule and considering his requests for religious accommodation with regard to virtually every schedule published during the relevant time frame have uniformly pointed to the following documents as governing and/or restricting their ability to accommodate Mr. Zirkind:    The Collective Bargaining Agreement between the Nation Air Traffic Controllers Association ("NATCA") and Defendant, the annual Memoranda of Understanding ("MOU") between NATCA and Defendant, and Defendant's Human Resource Policy Manual ("HRPM").

21.    The MOU is relevant to this matter to the extent that it requires that a minimum number of ATCSs be assigned to a shift depending on the time of day, the day of the week, and other factors. Crucially, the MOU only requires that a minimum number of ATCSs be assigned to a shift *when a schedule for a bi-weekly pay period is published by Defendant*.

22.    In fact, and in practice, the shift minimums do not apply to the number of ATCs who actually work each shift.

23.     HRPM is relevant only regarding the process by which ATCs are expected to request leave. It does not dictate when leave can be approved or when it must be denied.

**C.  The Scheduling Process**

24.     Months before the start of a calendar year, under the supervision of NATCA, the ATCs in each work group bid (essentially pick or draft by order of seniority) a weekly schedule including regular days off ("RDOs").

25.     Once the bidding process is complete, the ATCSs again bid based on seniority on block leave. Once that process is complete, the schedule is handed over to Defendant where the schedule is built to ensure that the minimum number of ATCSs required by the MOU is assigned to each shift.

26.     Eventually, 45 days prior to each two-week pay period, a schedule that covers each pay period of the year is published. Once the schedule is published, ATCSs can seek to use other leave or request to switch shifts or make other changes to their schedule through a platform called WMT.

27.     Such requests are supposed to be considered on a first-come-first-served basis without regard to the nature or reason for the requested leave (*e.g.*, religious accommodation vs. a desire to attend a family reunion or a child's soccer game).

28.     The WMT system is available to all ATCSs so that, with some exceptions, Mr. Zirkind can see who has requested leave, for what reason, when it was requested, and whether it was approved or denied.

29.     In addition to attempting to secure leave to accommodate his religious observance through the WMT system, on multiple occasions, Mr. Zirkind also requested leave and schedule changes for religious accommodation by email to his supervisor.

30. When it appears that a shift will fall below the minimum number required by the MOU after the schedule is published, Operations Supervisors and Operations Managers are permitted to "run the overtime list" whereby they call other ATCs to determine their availability to work overtime to cover that shift.

31. On many occasions, shifts occurred that were staffed below the number in the MOU if ATCSs could not be found to cover the shortfall.

32. This is the case because, pursuant to the MOU, the shift minimums must be met only when the schedule is published as they are a function of collective bargaining and are not required by regulation or any safety policy.

### D. Defendant's Failure to Provide Mr. Zirkind's Supervisors and Schedulers with Meaningful Guidance as to How to Accommodate Him

33. Because Mr. Zirkind's schedule in 2022 included shifts on Friday night and Saturday, and his schedule in 2023 included a Saturday shift, Mr. Zirkind required and sought accommodation for virtually every week. Nevertheless, Defendant failed to provide Mr. Zirkind's supervisors and schedulers with guidance as to how to accommodate him or handle his requests for religious accommodation in a lawful manner, other than to instruct them to ensure they comply with the documents referenced above (CBA, MOU, HRPM).

34. George Long III, who was Mr. Zirkind's first line supervisor from January 2022 through August 2022, was not told by Defendant in advance of assuming that role that Mr. Zirkind required religious accommodation due to his Sabbath observance. When he assumed that role, he had never encountered a request for religious accommodation before.

35. He sought guidance from his superiors as to how to handle Mr. Zirkind's regular requests for religious accommodation but was told Defendant's efforts were ongoing and that they were working on a solution.

36.    Finally, in April 2022, Defendant's Office of Civil Rights sent him a list of questions for Mr. Zirkind to answer regarding his religious beliefs and what accommodation he was looking for.

37.    The questions sought information that Defendant should have been aware of already as Mr. Zirkind had been requesting accommodation for several years prior.

38.    Mr. Zirkind provided the answers to Mr. Long who sent the information up the chain. Mr. Long never heard back from the Office of Civil Rights. Instead, he received an email on June 14, 2022 from Defendant's General Counsel's office detailing the scope of Defendant's legal obligations when receiving a request for accommodation like Mr. Zirkind's. The email stated, in relevant part, as follows:

> If the Agency were to deny the request for religious accommodation (not being assigned work on Sabbath, Friday sundown to Saturday sundown), the Agency would need to show "undue hardship". The EEOC defines undue hardship as more than a de minimis cost.
>
> In this case, you would need to show that your facility is understaffed, staffing is inadequate to cover the period every week, and that period is the busiest time of the week. Paying occasionally more premium pay, etc. is not an undue hardship. You would need to plan on the possibility of restoring adequate staffing levels.
>
> Further, you would need to develop a record that management actively sought alternatives like volunteers to cover the period, or swaps, or granting leave, up to and including leave without pay if necessary. Please note that granting sick leave as a way to accommodate this employee is an inappropriate use of sick leave. However, if you have been able to cover the shift(s} while the employee is on sick leave, this may undermine an argument that the staffing resources are inadequate to cover the shift(s) or that there is an undue hardship.

39.    Mr. Long sent the email from General Counsel to his superiors and awaited guidance as to how to accommodate Mr. Zirkind's religious observances.

40.     Throughout his time supervising Mr. Zirkind, Mr. Long was waiting for Defendant to come up with a plan to address Mr. Zirkind's requests for accommodation. When Mr. Long left his position as Mr. Zirkind's supervisor in August 2022, he had still not been provided with guidance as to how to handle Mr. Zirkind's requests for religious accommodation.

41.     Sara Surline, was, until March 2023, an Operations Supervisor at Washington Center where Mr. Zirkind was stationed.   She was not Mr. Zirkind's supervisor of record but was responsible for building the schedule for Mr. Zirkind's work group prior to the schedule being published.

42.     She, too, had never encountered a request for religious accommodation prior to Mr. Zirkind's and had never been trained as to how to handle such requests.

43.     She never received any guidance as to whether a request for religious accommodation had priority over other types of leave requests. On the occasions when she received Mr. Zirkind's requests for religious accommodation, she sent them to her superiors, including Mr. Lenard Carter, but never received any guidance as to how such requests should generally be handled.

44.     On multiple occasions, Ms. Surline sought input from her superiors as to how to accommodate Mr. Zirkind's religious accommodation requests, but, as of when she left her position as Operations Supervisor, she had not received it.

45.     Lonnie Cox was another Operations Supervisor at Washington Center during the relevant time frame. Though he was not Mr. Zirkind's supervisor of record, he was involved in attempting to address Mr. Zirkind's requests for accommodation to avoid working on the Sabbath.

46.     Mr. Cox had likewise never previously worked with a direct report who required religious accommodation. When Mr. Cox was presented with Mr. Zirkind's accommodation

requests, he consulted the CBA and the HRPM, attempted to speak with Defendant's management to identify a solution but did not get anywhere and was frustrated that he could not get an answer as to how to accommodate Mr. Zirkind.

47.    In determining how to accommodate Mr. Zirkind, Mr. Cox believed that leave requests regardless of their purpose (e.g., leave to attend child's soccer game v. leave to avoid working on the Sabbath) needed to be fair and equitable to all employees.

48.    Mr. Cox was never told by Defendant how to handle religious accommodation requests as a supervisor. The only guidance Mr. Cox received from his superiors was to follow the CBA's "staffing & workload permitting" requirement.

49.    Lenard Carter was the Operations Manager at Washington Center at the time Mr. Zirkind was assigned there in 2020 and remained in that position until May 17, 2023. At various relevant points, Mr. Long, Ms. Surline and Mr. Cox reported to him.

50.    Mr. Carter had also not previously encountered an ATCS who needed religious accommodation for scheduling purposes prior to Mr. Zirkind. He became aware of Mr. Zirkind's need for religious accommodation in the Fall of 2020.

51.    Mr. Carter's role regarding scheduling was to ensure the schedule met the MOU minimums when it was published and to entertain requests from his direct reports to go below that number after the schedule was published.

52.    Mr. Carter empowered his reports to go below the minimum number of ATCs on a shift in numerous scenarios, including, but not limited to, on a holiday, where there was low traffic volume, due to special events, when weather that limited air traffic, or where an ATCS was out on training.

53.     It was Mr. Carter's understanding that Article 26, Section 3 of the CBA needed to be considered in determining whether to approve Mr. Zirkind's requests for leave for religious accommodation and that if other ATCSs had requested leave for *any* reason prior to Mr. Zirkind making his request for religious accommodation, Defendant had to accommodate the request that came in first.

54.     In May 2022, Mr. Carter had a meeting with Steve Proffitt, his Executive Technical Representative, and Richard Parks, his Executive Officer, regarding Mr. Zirkind's accommodation requests.  They discussed the effect that workload had on approving accommodations, the meaning of "de minimis" as it pertained to Defendant's obligations. Ultimately, Mr. Carter was told "Keep doing what you're doing and follow the rules" (the CBA, HRPM and the MOU) and "we'll get back to you."

55.     It was Mr. Carter's expectation after the May 2022 meeting that something would come down from higher levels of Defendant's management team, instructing him how to handle Mr. Zirkind's requests for accommodation, but it never came.

56.     Mr. Carter received the June 14, 2022 email from General Counsel. He forwarded it up the chain to Defendant's management after which he discussed the "de minimis" information in the email with them because he did not understand what "de minimis" meant in the context of Mr. Zirkind's requests for religious accommodation.

57.     Regarding General Counsel's advice that Defendant would need to investigate bringing in additional staff if it could not accommodate Mr. Zirkind's religious observance due to staffing issues, the consensus among Defendant's management and others was that they would not do so because it would be mismanagement of taxpayer dollars and a waste of resources.

58.    Mr. Carter received no other guidance as to how to handle Mr. Zirkind's requests for religious accommodation.

### E.  Defendant's Failure to Reasonably Accommodate Mr. Zirkind on a Pay Period by Pay Period Basis

59.    Defendant has refused to grant Mr. Zirkind reasonable accommodation that would permit his religious observance.

60.    Examples of this refusal on the part of Defendant include but are not limited to, allowing Mr. Zirkind to earn religious comp time but then prohibiting him from using religious comp time to avoid working on the Sabbath, the very use for which it is intended, prohibiting him from working a shift to cover for another ATCS who is on leave instead of his Sabbath shift resulting in Defendant paying overtime to other ATCSs to cover both his Sabbath shift and the shift of the other ATCS who is on leave, and refusing to assign him a shift schedule that would not have required him to work on Friday evenings or on a Saturday before nightfall.

61.    At no point did Defendant ever indicate to Mr. Zirkind that its refusal to accommodate him was in any way due to substantial increased costs Defendant would need to incur to accommodate his religious beliefs.

62.    Rather, virtually every time his request for accommodation was denied, the reason given was "staffing, "workload" or both with little to no explanation provided as to how Defendant made the decision to grant his request for religious accommodation or what the particular "staffing" and/or "workload" issues were.

63.    Furthermore, Defendant appears to have deliberately made it difficult for him through its inconsistent application of its "rules," by, for example, having him sign a document acknowledging that he must request regular days off ("RDOs") prior to the schedule being

11

published and then, when he did so, informing him that RDOs cannot be requested prior to the schedule being published.

64.     In addition, there were times when his requests for accommodation have been denied because the result would be less than the minimum number of qualified individuals working the shift per NATCA's MOUs with Defendant, but when leave was requested by others for non-religious reasons, it was granted even though the result was less than the minimum number of qualified employees on the shift.

65.     Furthermore, Defendant has allowed his colleagues to take leave after refusing his request to take leave.

66.     Defendant has never attempted to call Mr. Zirkind's colleagues to offer them overtime to cover his shift ("run the overtime list") when he requested not to work on the Sabbath. Yet, Defendant will do so to find coverage for his colleagues who are taking other types of leave.

67.     Defendant will not "run the overtime list" to cover Mr. Zirkind's shift in response to his request for accommodation for his Sabbath observance. However, when the staffing on Mr. Zirkind's shift falls below the minimum as a result of Defendant denying Mr. Zirkind's request for religious accommodation thereby leaving him with no choice but to call in sick to avoid being AWOL, Defendant *will* run the overtime list to "backfill" the shift.

68.     Additionally, there have been times when he requested to work a shift that was understaffed in place of his Sabbath shift – a solution which would have solved two issues for Defendant. However, his requests were denied, and Defendant called in overtime to cover both the understaffed shift and his shift because he could not work the Sabbath shift and had to take leave.

69.     By way of example, on July 23, 2023, Mr. Zirkind requested leave for August 5, 2023 for Sabbath observance. Three of his colleagues put in leave requests *after* he did, and their

requests were approved while his was denied. Five of his colleagues were called in to work overtime that shift, one of whom could have covered his shift had Defendant approved his leave request. The night shift went forward on August 5, 2023 one ATC short of the minimum in the MOU.

70. Perhaps with one exception relating to a single shift, no one from Defendant's management has ever approached Mr. Zirkind to let him know that they even attempted to arrange a shift or line swap for him with one or more of his colleagues so that his Sabbath observance could be accommodated.

71. Upon information and belief, Defendant has never considered hiring more staff to be able to accommodate Mr. Zirkind's need for religious accommodation.

72. Upon information and belief Defendant's personnel budget for fiscal years 2020-2023 was multiple billions of dollars each fiscal year.

73. Defendant conceded during the EEO hearing process that the cost of paying another ATCS overtime to cover every one of Mr. Zirkind's Sabbath shifts would be under $200,000, a cost of well under 1/100 of one percent of Defendant's personnel budget.

74. Mr. Zirkind has proposed multiple potential accommodations that would resolve the issues presented by his Sabbath observance, but Defendant refused to consider them. These included:

A. Creating a line that does not require Mr. Zirkind to work on Friday night or Saturday in the 2024 leave year. Upon information and belief, this was done in 2024 year for an ATCSs who did not want to work overnights, and upon information and belief, in 2023, a schedule was built for an ATCS who wanted to work 16:00 – midnight for every shift. Defendant refused to even consider creating a line that would accommodate Mr. Zirkind's Sabbath observance even though the line could have been made unattractive for anyone else and would likely not have been bid on by anyone else.

B. Permitting Mr. Zirkind to work shifts taken off by other ATCS's instead of working on the Sabbath. Currently, Defendant denies such requests and ends up paying other ATCS's overtime to fill in both shifts when Mr. Zirkind can't come in on the Sabbath.

C.    Considering alternate work schedules before the schedule is released and/or before the work week that would accommodate Mr. Zirkind.

D.    Permitting Mr. Zirkind to *use* religious comp time and build such time into the schedule.

E.    Running the overtime list to fill in Mr. Zirkind's Sabbath shifts as is done for people with less valid reasons for not being available.

F.    Permitting a shift to proceed with less than the negotiated number of ATCSs per shift on Friday nights and/or Saturdays, a practice that occurs regularly.

G.    Not prioritizing and granting other ATCS's leave requests received after Mr. Zirkind's Sabbath-based requests.

H.    Not designating the time taken off for Sabbath as "leave" so it does not count toward the maximum shifts per week thereby permitting Mr. Zirkind to actually work more hours to make up religious comp time and/or to work overtime.

I.    Modifying the schedules when they are built to accommodate Mr. Zirkind regardless of the line he bid. Defendant moves people off the schedules they bid as needed on a regular basis.

## F.    Mr. Zirkind Engages in the EEO hearing Process

75.    Mr. Zirkind initiated counseling with an EEO counselor on June 17, 2022, filed a formal complaint with the EEO on September 22, 2022, a Report of Investigation was issued on January 4, 2023.

76.    Mr. Zirkind engaged in the EEO hearing process between January 2023 and January 2025 before requesting a Final Agency Decision which was issued on March 24, 2025.

77.    During the hearing process, Defendant offered a variety of explanations at different times as to why it refused to accommodate Mr. Zirkind or even make a reasonable attempt to do so.

78.    Among the reasons provided were staffing shortages, traffic volume, and workload, as well as the cost to Defendant of accommodating Mr. Zirkind. None of these reasons was/is valid.

14

79.     Ultimately, for the first time in the Final Agency Decision, Defendant concluded, incorrectly, that permitting Mr. Zirkind to use sick leave (which violates its own policies and the MOU) was a reasonable accommodation.

## COUNT I – RELIGIOUS DISCRIMINATION
### Title VII of the Civil Rights Act of 1964, as amended

80.     Mr. Zirkind incorporates by reference the allegations in Paragraphs 1-78 of this Complaint as if fully set forth herein.

81.     Mr. Zirkind has a bona fide religious belief, *i.e.*, that he may not work on the Jewish Sabbath, which conflicts with his employment as an Air Traffic Controller Specialist for Defendant.

82.     Mr. Zirkind informed Defendant of this belief and the conflict with his employment that it presented.

83.     Defendant has failed to make a reasonable effort to accommodate Mr. Zirkind's religious beliefs even though the accommodations proposed and requested by Mr. Zirkind would not pose an undue hardship for Defendant as that term has been interpreted by the Unites States Supreme Court.

84.     Defendant has accommodated requests by other Air Traffic Control Specialists for leave for reasons unprotected by law while denying Mr. Zirkind's requests for leave or to use his religious compensatory time.

85.     In violation of its own policies, Defendant has prioritized such requests over Mr. Zirkind's requests for religious accommodation despite Mr. Zirkind's requests being made earlier.

86.     Defendant enforced, and continues to enforce, its requirement that Mr. Zirkind work shifts on the Sabbath compelling Mr. Zirkind to use annual leave and parental leave to observe his religion and avoid working on the Sabbath.

87.    Defendant enforced, and continues to enforce, its requirement that Mr. Zirkind work shifts on the Sabbath compelling Mr. Zirkind to use sick leave to observe his religion and avoid working on the Sabbath, which violates Defendant's policies.

88.    As a result of Defendant's actions, Mr. Zirkind has been deprived of the use of approximately 1000 hours of leave, a significant element of his compensation, for its intended purpose over a period of years.

89.    As a result of Defendant's actions, Mr. Zirkind has been compelled to expend significant sums on attorney's fees and costs attempting to compel Defendant to accommodate his religious beliefs.

WHEREFORE, it is respectfully requested that the Court enter judgment in Mr. Zirkind's favor as to his claims in this Complaint and award Plaintiff the following relief:

1)    Restore to Mr. Zirkind, and/or compensate Mr. Zirkind for any and all leave that he has been forced to use to avoid working on the Sabbath because of the Defendant's unlawful conduct;

2)    Provide Mr. Zirkind with a reasonable accommodation that will permit him to continue his employment with Defendant while observing his religious beliefs;

3)    Compensate Mr. Zirkind for the attorney's fees and costs he has incurred both at the Agency/EEO level and associated with the instant lawsuit; and

4)    Any other or further relief that the Court deems just and appropriate.

16

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: May 30, 2025

Respectfully submitted,

Joseph B. Wolf (Federal Bar No. 27882)
**WOLF LEGAL, LLC**
37 Walker Avenue, Second Floor
Pikesville, Maryland 21208
Telephone: (410) 345-0345
joseph@jwolflegal.com
*Counsel for Plaintiff*

17